UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| S&J DIVING INC, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. G-10-368 |
| § | |
| PROCENTURY INSURANCE COMPANY, § | |
| § | |
| Defendant. § | |

## **MEMORANDUM AND ORDER**

**I.**

Before the Court, for trial, is the plaintiff, S & J Diving, Inc.'s, suit for recovery on a claim that arises out of a marine hull policy that the plaintiff claims arises from damages incurred by the DEEP SEA CHAMPION during Hurricane Ike, on or about September 12, 2008. The policy at issue was issued by the defendant, Procentury Insurance Co., policy no. PIC 101389 that provided hull and P & I coverage. The Court received testimony and documentary evidence and now, hereafter, renders findings of fact and conclusions of law.

**II.**

The plaintiff contends that it submitted a claim to its agency, *Century Ocean Marine*, on October 24, 2008, and that its agency sent notice to *Century Insurance Co.* on October 28. After submitting the claim, the defendant refused to pay the plaintiff's claim in part or whole. The plaintiff asserts that as a result, the defendant breached the contract and is indebted to it in the amount of $494,461.43.

The defendant contends that damages claimed by the plaintiff are not policy related in that the policy does not cover "wear, tear, deterioration, or maintenance." Further, that the

policy does not cover "consequential damages" such as lost opportunities or loss of hire.  In addition, the defendant asserts that the plaintiff failed to provide prompt notice of its claim such that it could fully investigate, conduct a joint survey, select a repair yard, approve repairs and/or send out a tender for the repairs.  Therefore, the plaintiff failed to comply with the policy requirement and thereby prejudiced the defendant's position.

### III.

The plaintiff does not dispute that it owed a duty to provide prompt notice of its claim to its insurer.  *See Blanton v. Vesta Lloyds Ins. Co.*, 175 S.W.3d 607, 611 (Tex. App.—Dallas, 2006).  When an insurer claims that it has been prejudiced by an insured delay, a question of fact is presented.  *See Trumble Steel Erectors v. K & S Group, Inc.*, 304 Fed. Appx. 336 (2008), 2008 WL 5210368 (5th Cir. Dec. 15, 2008).  However, the question of the timeliness of a notice to the insurer by the insured is a question of law.  *See Employer Casualty Co. v. Glens Falls Ins. Co.*, 484 S.W.3d 570, 576 (Tex. 1972).  A failure to give prompt notice does not mean that the insurer is relieved of its obligation under the policy.  Instead, the Court is to determine whether the delay caused prejudice and the extent, if any, of the harm engendered by the delay.  *See Hanson Prod. Co. v. Ams. Ins. Co.*, 10 F3d 627, 631 (5th Cir. 1997).  The burden rests on the insurer to show that prejudice resulted and the nature and extent of any prejudice.  *See* 13 Russ & Segalla, Courch on Insurance § 193:29; *see also Clarendon Nat'l Ins. Co. v. FFE Transp. Servs., Ins.*, 176 Fed. Appx. 559, 562 (5th Cir. 2006) (per curium)(unpublished).

### IV.

In order for the plaintiff to establish its claim, the evidence must show that the loss or damage was proximately caused by the peril insured against.  *See Abilene Sav. Ass'n v.*

*Westchester Fire Ins. Co.*, 461 F2d 557, 559 (5th Cir. 1972).  In the case at bar, the Court makes the following findings of fact and conclusions of law:

  S&J utilized the 1979 offshore supply (diving) vessel DEEP SEA CHAMPION to provide its dive services.  At the time of the incident made the basis of this lawsuit, the DEEP SEA CHAMPION was owned by the entity Deep Sea Champion.  The DEEP SEA CHAMPION was seized and sold at auction in 2011.

  S&J obtained hull and protection and indemnity insurance for the DEEP SEA CHAMPION through it broker, Swantner & Gordon, from Defendant ProCentury Insurance Company. ProCentury Insurance Co. ("ProCentury") issued Commercial Ocean Marine Policy No. PIC101389 ("Policy"), to S&J.  The Policy provided insurance coverage in the insured amount of $3,000,000 with a $30,000 hull deductible and $50,000 machinery deductible for the policy period December 19, 2007 to December 19, 2008.  The Policy warranted that navigation was limited to the Gulf of Mexico.

  The DEEP SEA CHAMPION was scheduled to undergo a five year inspection from the American Bureau of Shipping ("ABS") in October, 2008.  As part of the process of preparing for this inspection, S&J prepared a list of items that required repair or refurbishment.  This list was created in January, 2008.  Shortly thereafter S&J solicited a bid from R&R Marine for repair work.

  On August 26, 2008, S&J's Operations Manager, Matt Belair, drafted email correspondence to Pat Plake at R&R Marine in Port Arthur, with a list of repairs required for the DEEP SEA CHAMPION as part of preparing for the Vessel's ABS survey.  Belair stated that S&J wanted to muck out all the tanks; waterblast; remove and replace bad metal; coat the tanks; 100% of the deck, hull, bow, stern and three gerth belts; replace any metal that is bad; remove,

repair and bring horse heads up higher; shorten cal-catchers; remove decompression chambers from down below and replace with new; install new anodes; sandblast; and paint the Vessel from top to bottom.

On September 9, 2008, the DEEP SEA CHAMPION departed from the Galveston Harbor, Anchorage docks on its way to R&R Marine. Captain Hazen Dennison and Engineer Dieter Bubendey were aboard the Vessel during this voyage. The DEEP SEA CHAMPION arrived at R&R Marine on September 10, 2008 at 10:00 a.m. The Vessel was not put on dry dock at this time.

On September 11, 2008, S&J determined that the Vessel would need to move from the ship yard because Hurricane Ike was looming over Port Arthur. The crew secured the equipment on deck and departed from R&R Marine on September 12, 2008.

The Vessel headed towards Lake Charles, but was prevented from entering Lake Charles because the United States Coast Guard ("USCG") locked the canal. Instead, Captain Hazen Dennison navigated the Vessel into the Intercoastal Waterway and anchored the Vessel somewhere on the Intercoastal Waterway. There are no records stating the precise latitudinal and longitudinal location of the Vessel.

According to Captain Hazen Dennison, the Vessel was anchored in a very long straight that was twenty feet deep and one hundred yards wide. The captain lowered four anchors – with one thousand feet of line extended on each anchor. The bow of the ship faced southeast. The Vessel sat anchored for one day before storm winds began to blow.

On September 12, 2008 – while the Vessel sat anchored waiting for the storm to approach – engineer Dieter Bubendey removed, cleaned and reinstalled the starter from the port main

engine. Bubendey did this because he believed that the starter was the reason why the engine was not running properly.

This was also not the first time that there were problems with regard to operation of the port main engine. On January 29, 2008, Vessel engineer Ken Delaney reported that water was found in the oil. This problem was reported by Delaney again on March 5, 2008. On March 12, 2008, it was determined that the oil coolers were bad and required replacement. The oil coolers were replaced on March 18, 2008.

Then, on May 19, 2008, Bubendey installed a new starter on the port main engine. This starter was supplied by A/M Sales and Service. On May 27, 2008, A/M Sales and Services sent an invoice indicating that the previous starter required a rebuild.

Hurricane Ike hit the Port Arthur and the surrounding area on September 13, 2008. According to Captain Dennison, winds reached speeds as high as 130 miles per hour.

After the storm passed, and the winds were no greater than 70 miles per hour, Captain Dennison went to the bridge to survey the Vessel. Despite the strong winds, Captain Dennison determined that the Vessel did not move. The Vessel did not ground. Quite the contrary, the only condition that changed was that the water level rose approximately twelve feet due to the storm surge.

Captain Dennison discovered that one wheelhouse window was broken. This window was located in the starboard after-corner area of the wheelhouse. Other than the wheelhouse window, Captain Dennison noted that the ship was covered with dirt, grass, snakes, an alligator and other light debris. The crew took the Vessel's fire hose and cleaned off the deck, other than the alligator, which apparently made for a nice dinner.

The Captain also performed a visual inspection of the Vessel to determine whether there were additional damages from Hurricane Ike. This inspection was performed on areas above the water line. Captain Dennison inspected the steering routers, tail shafts, steering assembly, the stern of the Vessel and the bumper pipes. In performing this inspection, Captain Dennison determined that the only damage he saw was the broken window and debris.

Captain Dennison did contact S&J offices after the storm. He reported that all crew members were all right, the Vessel looked good, and the equipment was working. He also reported that the main problem was that the window was broken and some of the company books and logs were soaked. The logs and company books were put aside to dry. In lieu of the log book, Captain Dennison reported that he used individual sheets of paper to record his notes. These sheets were not produced by S&J during discovery.

During this time, the Vessel was required to remain anchored in its place until the USCG cleared the channel for travel. The Vessel remained in place until September 17, 2008, when it travelled to Star Dock in Berwick, Louisiana.

On September 16, 2008, Engineer Bubendey changed the port main engine starter again. He reported that the engine would not start and seemed, to be in a bind, or bendix, and was hanging up on flywheel teeth.

At approximately 10:00 p.m. on September 17, 2008, a diesel mechanic went aboard the Vessel to work on the port main engine. The log does not identify the diesel mechanic. However, email correspondence dated November 18, 2008, between David Ballard of S&J and Ramus Martin of RAM Logistics indicates that RAM Logistics sent an engineer to the boat at night time and worked without the assistance of an engineer. Bubendey acknowledged that on the evening of September 17, 2008, he only briefly met with the engineer. RAM Logistics

recommended that the engine's injectors be examined, but Bubendey disagreed with this assessment and turned him away.

On September 18, 2008, Engineer Bubendey reported that a diesel mechanic from Marine Systems, Inc. could not find why the engine starter would not work. Bubendey told him that the engine was binding up because of new starters. The mechanic provided Bubendey with an exchange starter. They barred over the engine and it started.

On September 18, 2008, the crew of the Vessel was told it would be handling an emergency job before heading back to the Shipyard. Shortly after leaving the Star Dock in Berwick, Louisiana, the port main engine failed. The emergency job was cancelled on September 19, 2008, after the client, Mariner Energy, discovered that S&J never had the dive spread capacity that Mariner required to perform the job.

On September 19, 2008, the mechanic from Marine Systems, Inc. arrived and inspected the engine, it was determined that the engine required overhaul. Specifically, the mechanic found copper debris at the bottom edge of the block under the valve covers. The mechanic removed the oil pan base plates and found larger pieces of copper debris in the center area of the oil pan. The 6LB and 6RB pistons appeared burnt. The engine also had coolant leaking past the liner o-rings at 6LB, 6RB and 7RB cylinders into the airbox. The mechanic advised S&J to remove the oil pan and inspect further for possible rod or main bearing failure. However, S&J elected to discontinue repairs until it reached R&R Marine.

The Vessel arrived at R&R Marine on September 22, 2008. The crew members were escorted off of the Vessel, immediately removed from the premises, and were boarded on a shuttle headed for the airport early the following morning. Their statements regarding the

hurricane were neither requested nor taken.  They did not speak with any workers at the shipyard about any suspected hurricane damage.

On October 5, 2008, the Vessel was placed in dry dock at Gulf Copper & Manufacturing Corp for repairs.

On October 13, 2008, Stanley Jones sent email correspondence to Earl Hatfield, asking him what time he would be available on October 14, 2008 to perform a valuation survey of the Vessel.  There was no mention of a damage survey, hurricane damage or an insurance claim in the correspondence.

On October 14, 2008, S&J's surveyors Robert Reider and Earl Hatfield of Earl Hatfield Marine Surveyors inspected the Vessel while she lay in dry dock at the R&R facility.

Also surveying the Vessel on October 14, 2008, were Kelly Sprague of Design Associates, Nathan Schilling of James Moon, and a representative from the American Bureau of Shipping.  Sprague was preparing plans for major renovations of the Vessel, particularly with regard to adding a new dive chamber, adding additional crew quarters and reducing the tonnage. ABS was present with regard to the required ABS special 5 year survey.

Stanley Jones and David Ballard attended the survey of the Vessel.  Reider testified that Jones guided Hatfield and him to areas he [Jones] believed suffered hurricane damage.  In contrast, Jones testified that Hatfield pointed out hurricane damage.

Hatfield and Reider testified that they did not investigate the damage, whether it pre-existed Hurricane Ike or whether it was caused by Hurricane Ike.  Reider, at Hatfield's direction, merely recorded Jones' identifications.

At the time of the survey, several of the items identified by Jones and Ballard as damaged by the hurricane had already been removed from the Vessel. These included the engine,

propellers, rudders, wheels, jockey bars, tiller arms, windows and tailshafts. Earl Hatfield Marine Surveyors did not view these items before they were removed from the Vessel. There is no photographic documentation demonstrating the condition of these items before they were removed from the Vessel. United States Coast Guard ("USCG") records reflect that USCG also did not have an opportunity to inspect the tailshafts. More importantly, the USCG inspector stated that there was no non-destructive testing of the tailshafts and that the tailshafts were merely pulled and reinstalled but not repaired.

As early as October 8, 2008, and thru at least October 17, 2008, S&J was in contact with their broker, who in turned contacted Mike Hartley of Century Ocean Marine, regarding obtaining additional charterers legal liability coverage on a vessel that S&J intended to lease for use in their dive operations. At no time during these communications did S&J or their broker indicate to ProCentury that S&J intended to make a claim for hurricane damage, that the Vessel was in drydock and undergoing repairs.

On October 28, 2008, forty-six days after the Vessel allegedly sustained damages caused by Hurricane Ike, S&J notified ProCentury of its claim.

As part of its notice, S&J's broker attached an Acord Property Loss Notice stating that the Vessel ran aground as a result of Hurricane Ike.

Attached to the Acord Property Loss Notice was the first version of the October 14, 2008 survey from Earl Hatfield Marine Surveyors, which did not contain estimates for the items S&J identified as requiring repairs. (Reider issued 4 different versions of the survey dated October 14, 2008).

The first version of the October 14, 2008 survey listed seven areas damaged by Hurricane Ike – Number 2 port ballast tank; port and starboard propellers; main steering rudder; port and

9 / 17

starboard tailshafts, steering assembly, stern bumper rails; and wheelhouse windows. In another version, Reider added damages to the Numbers 5 and 6 port and starboard ballast tanks and the port main engine. In later versions the Numbers 5 and 6 port and starboard ballast tanks were removed from the survey, having been considered a pre-existing damage.

Although these items were identified in the October 14, 2008 survey, records from Gulf Copper indicate that the rudders, tailshafts and engine were removed from the Vessel and repaired and/or maintenanced on October 3, 2008 – eleven days before Earl Hatfield Marine Surveyors attended the Vessel and twenty-five days before ProCentury was notified of the claim.

The propellers were removed on October 9, 2008 – five days before Earl Hatfield Marine Surveyors attended the Vessel and twenty-one days before ProCentury was notified of the claim.

The wheelhouse window damaged during the storm was removed on October 10, 2008 – four days before Earl Hatfield Marine Surveyors attended the Vessel and eighteen days before ProCentury was notified of the claim.

The jockey bars and tiller arms were removed on October 13, 2008 – one day before Earl Hatfield Marine Surveyors attended the Vessel and fifteen days before ProCentury was notified of the claim.

Evidence shows that no repairs were ever made to the stern bumper rails described in the October 14, 2008 survey.

Upon repair, the claim was immediately assigned to ProCentury's James Ohlfest. After several attempts to contact Stanley Jones, Ohlfest finally reached Jones on November 4, 2008. At that time, Jones indicated that he had not received an update from the surveyor at that time. Jones also indicated he would try and identify a contact at the Shipyard. Ohlfest also contacted Reider on November 4, 2008. During the call, Reider relayed his belief that the Vessel repairs

were "well under way, if not nearing completion" and projected $500,000 in storm damage in additional to routine maintenance. Reider indicated that he was preparing a supplemental report to the original survey to include cost estimates.

Photographs taken by Earl Hatfield Marine Surveyors document that the Vessel had already been removed from dry dock and returned to the water on November 4, 2008. The photographs also document that the Vessel had been painted from bow to stern. Neither Jones nor Reider advised Ohlfest that the Vessel had been removed from the dry dock.

On November 6, 2008, via e-mail, Earl Hatfield sent Reider's "field survey" to Ohlfest and stated that the estimated cost of repairs was $500,000. At that time, Ohlfest requested he be sent a cost spreadsheet identifying what repairs were being completed in connection with Hurricane Ike. Ohlfest did not receive this spreadsheet until November 17, 2008 – when repairs to the Vessel were complete or nearly complete.

On November 6, 2008, ProCentury hired its own surveyor, WK Webster (Overseas) Ltd. ("WKW"), to inspect the Vessel and determine the extent the Vessel was damaged by Hurricane Ike as well as the cost to repair those damages. Richard Frenzel was appointed to survey the Vessel on behalf of ProCentury.

On November 20, 2011, Frenzel joined Reider for a joint survey. Reider, however, refused to sign the joint survey. According to Frenzel, the shipyard was unaware that any repairs had been claimed as hurricane damages, so the shipyard could not provide invoices for the items he had requested. Frenzel issued his Preliminary Report on November 21, 2008.

On November 20, 2008, ProCentury issued a reservation of rights letter to S&J while continuing to investigate the claim. In the letter, ProCentury specifically reserved its rights to decline coverage due to late notice because of the adverse effect the late notice had on

ProCentury's rights under the Policy to investigate and adjust the claim. Moreover, ProCentury informed/reminded S&J that it was required to cooperate in the investigation, documentation and support of the claim.

On January 9, 2009, Frenzel issued his Final Report. In the report, he again relayed that the shipyard could not prepare invoices for hurricane damage because it was unaware that a claim for hurricane damage was being made. He also indicated that Reider still would not sign a Joint Field Survey, instead opting to submit estimates from his Preliminary Survey. Frenzel concluded that despite his repeated attempts to get accurate repair information from S&J and its surveyors, no additional information or assistance was forthcoming. As such, he concluded that the only area of the Vessel being claimed as hurricane damage was the broken wheel house window. Given the lack of additional documentation from S&J, and given the extensive amount of work being done to the Vessel, he concluded that all other repairs identified by Reider were related to previously scheduled maintenance and refurbishment.

Notably, the cost of the one item of storm related damage – the broken wheel house window – was well below the policy's $30,000 deductible.

The Court finds that the surveyors' reports prepared by Richard Frenzel were objectively prepared. The Court further finds that the multiple reports prepared by Earl Hatfield Marine Surveyors are not supported by the evidence and are not credible.

The Court finds that the four damage survey reports with recommendations drafted and/or reviewed by Earl Hatfield and/or Robert Reider are not reliable and are not grounded in the methods and procedures of science.

On January 26, 2009, after receipt of Frenzel's Final Report, ProCentury adjusted S&J's claim based on the very limited information that S&J provided and information that Frenzel

provided.  As the cost to repair the wheel house window did not exceed the policy deductible, ProCentury properly found that no amount was due to be paid under the policy.

The Court finds that ProCentury was not promptly notified of the claim as required by the Policy. ProCentury was not given the opportunity to survey the Vessel damage prior to the repairs being undertaken.  Consequently, ProCentury was unable to adjust the claim based on unfiltered and unconfirmed information, as well as subjective observations.

The Policy provides in relevant part:

AMERICAN INSTITUTE HULL CLAUSES COVERAGE FORM<br>(June 2, 1977)

CLAIMS (GENERAL PROVISIONS)

In the event of any accident or occurrence which could give rise to a claim under this Policy, prompt notice thereof shall be given to the Underwriters, and:

a) where practicable, the Underwriters shall be advised prior to survey, so that they may appoint their surveyor, if they so desire;

b) Underwriters shall be entitled to decide where the Vessel shall proceed for docking and/or repair (allowance to be made to the Assured for the actual additional expense of the voyage arising from compliance with the Underwriters' requirement);

c) Underwriters shall have the right of veto in connection with any repair firm proposed;

d) Underwriters may take tenders or may require in writing that tenders be taken for the repair of the Vessel, in which event, upon acceptance of a tender with the approval of the Underwriters, an allowance shall be made at the rate of 30 per cent per annum on the amount insured, for each day or pro rata for part of a day for time lost between issuance of invitations to tender and the acceptance of a tender, to the extent that such time is lost solely as a result of tenders having been taken and provided the tender is accepted without delay after receipt of the Underwriters' approval;

The Court finds that it was practicable for S&J to advise ProCentury of its alleged loss prior to the October 5, 2008 drydocking and prior to the October 14, 2008 survey, as required by the Policy.

By virtue of its decision to wait forty-six days to report its claim, and by virtue of its decision to dock and repair the Vessel before reporting its claim, S&J deprived ProCentury of its right to decide where the DEEP SEA CHAMPION was docked and/or repaired.

Because of the deprivations described above, S&J failed to provide ProCentury with prompt notice of a claim for loss to the DEEP SEA CHAMPION and thereby prejudiced ProCentury.

S&J removed the engine, propellers, rudders, wheels, jockey bars, tiller arms, windows and tailshafts prior to any survey.  There are no photographs of the alleged damages items while they were still installed on the Vessel.

S&J did not report or advise the shipyard that they were claiming certain areas of repair as hurricane damage.

The shipyard provided time and materials billing for all of its services.  There is no itemization of services, nor is there any segregation between ABS related repairs, general maintenance and refurbishment, and hurricane-related repairs.

Given the totality of the circumstances, the weight of the evidence, and the credibility of the witnesses testifying at trial, it is apparent that ProCentury was wholly deprived of any ability to determine whether the damages alleged were actually related to the hurricane, and thereby prejudiced.

This Court determines that the only recoverable damage is for repairs related to the broken wheelhouse window. However, there is no evidence that the repairs related to this window exceed S&J's deductible of $30,000.

In making the above findings of fact, reference has been made to certain parts of the record, however the Court has taken into consideration all of the evidence presented. The Court specifically finds that credible evidence, after considering the appearance, demeanor and qualifications of the witnesses and testimony as a whole, supports each of the above findings by a preponderance of the evidence.

The Court has jurisdiction over the parties and this matter pursuant to its admiralty and general maritime jurisdiction under 28 U.S.C. § 1333 and Rule 9(h), and the Policy is valid.

The Policy is one of marine insurance since it insures against certain maritime risks and losses. A marine insurance contract is governed by federal maritime law. The Fifth Circuit holds that the interpretation of a marine insurance contract is governed by state law in the absence of a specific and controlling federal law.

In order to establish a successful claim for breach of a contract under Texas law, it is incumbent upon S&J to establish: (1) a valid contract; (2) performance or a tendered performance by one party; (3) nonperformance of the contract by the other party; and (4) damages incurred as a result.

## V.

The Court holds that S&J did not perform its duties under the Policy. Specifically, S&J failed to provide prompt notice of its claim. The policy clearly states that, where practicable, the Underwriters shall be advised prior to survey, so that they may appoint their surveyor, if they so desire. S&J had no trouble scheduling ABS, Hatfield Marine Surveyors, James Moon and Design

Associates for vessel surveys.  S&J was even able to coordinate these surveyors to be at the Vessel on the same day – October 14, 2008.  S&J has not provided any testimony explaining why it was not practicable to notify Underwriters of a potential claim.  S&J, through its broker, was in touch with ProCentury as early as October 8, 2008 through at least October 17, 2008, in an effort to obtain additional coverage.  But S&J did not inform ProCentury of any alleged hurricane damage, drydocking of the vessel or ongoing repairs.

Given the Vessel's return to the water on or before November 4, 2008, ProCentury had no way of independently verifying the damages claimed by S&J. Moreover, testimony and evidence revealed that ProCentury was only supplied with time and materials billing that did not distinguish between alleged hurricane damage and repairs and refurbishments being made at the direction of S&J and/or ABS.

Under these facts and circumstances, S&J did not perform or tender performance as required under the Policy.

S&J has not met its burden to prove that ProCentury breached the contract.  The evidence proves to the contrary.  ProCentury performed under the Policy.  ProCentury promptly contacted S&J to begin investigating the claim.  ProCentury regularly requested information from S&J to help the adjustment of the claim but were not provided with the material requested.  ProCentury was not told by Jones or Earl Hatfield Marine Surveyors that the Vessel was removed from dry dock and returned to the water within a week of reporting the claim.  ProCentury's surveyor's delayed attendance of the Vessel on November 20, 2008 is inconsequential under the circumstances – there was nothing he could have viewed since the Vessel had already been repaired and returned to the water by the time ProCentury first spoke with Jones.  Thus, the allegation that ProCentury breached the contract fails.

Furthermore, the failures alleged against ProCentury by S&J did not cause their claimed consequential damages. S&J did not lose the Mariner Energy job because of ProCentury – it lost the job because Mariner discovered that S&J never had the dive spread capacity that Mariner required to perform the job. Further, the policy in question provides no cover for lost opportunities or loss of hire.

It is clear that the Policy provides no coverage for consequential damages. As such, this Court holds that S&J's claims involving loss of opportunity and loss of hire are not recoverable under the Policy.

The overwhelming credible evidence introduced at trial shows that at the time Hurricane Ike passed over the Vessel, the Vessel suffered one cracked wheelhouse window and had debris on its deck. However, nothing in the shipyard's records suggests that the Vessel suffered additional hurricane damage. S&J's own surveyors made no attempt to investigate whether the damages claimed by Stanley Jones were attributable to the hurricane. As such, the Court concludes that ProCentury appropriately proceeded with adjusting the casualty as not having met the Policy deductible and satisfied its duties under the Policy.

## Conclusion

Based on the findings of fact and conclusions of law heretofore stated, the plaintiff shall take nothing by its suit.

It is so Ordered.

SIGNED at Houston, Texas this 4th day of June, 2012.

_____
Kenneth M. Hoyt
United States District Judge